UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RON MEGASON, on behalf of himself and others
similarly situated,

                 Plaintiff,

        -v-

STARJEM RESTAURANT CORP. d/b/a FRESCO
BY SCOTTO,

              Defendant.

---

Case 12-cv-1299 (NRB)

ECF Case

**ORAL ARGUMENT REQUESTED**

---

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFF'S RULE 23 MOTION

---

LITTLER MENDELSON, P.C.
Attorneys for Defendant
Starjem Restaurant Corp. d/b/a
Fresco by Scotto
900 Third Avenue
New York, New York 10022-4834
(212) 583-9600

Of Counsel:
    Craig R. Benson, Esq.
    George B. Pauta, Esq.
    Naveen Kabir, Esq.

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ......................................... 2

STATEMENT OF FACTS ................................................................................. 3

    A.    Tip Pool Operation .................................................................... 3

    B.    Job Duties of Challenged Tip Pool Participants ...................... 5

        1.    Runner/Expediters ........................................................... 5

        2.    Busboys/Stockers ............................................................ 6

        3.    Floor Captains ................................................................. 8

        4.    Party Captains ................................................................. 8

ARGUMENT ..................................................................................................... 9

I.    THE STANDARD FOR CERTIFYING A RULE 23 CLASS ...................... 9

II.    PLAINTIFFS' TIP POOL CLAIM IS NOT SUITED FOR CLASS
TREATMENT ............................................................................................ 10

    A.    Plaintiffs Cannot Establish Commonality Under Rule 23(a)(2) ......................... 10

        1.    Plaintiffs' Evidence on the Actual Duties Performed by Stockers
and Expediters Is Insufficient ................................................ 11

        2.    Plaintiffs Have Failed to Establish that Messrs. Vosilla and Drill
are Ineligible to Receive Tips Under § 196-d ......................... 15

    B.    Marco Barrera Is An Inadequate Class Representative Under Rule 23(a)(4) ...... 18

    C.    Plaintiffs Cannot Satisfy the Requirements of Rule 23(b)(3) ............................ 19

        1.    Individualized Inquiries Will "Inevitably Overwhelm" Questions
Common to the Class ................................................................ 20

        2.    Judicial Economy Would Not Be Served By a Class Action ................. 22

TABLE OF CONTENTS
(CONTINUED)

PAGE

III.   PLAINTIFFS' SPREAD PAY CLAIM IS ALSO NOT SUITABLE FOR CLASS
       TREATMENT UNDER RULE 23 ................................................................................ 22

       A.   Plaintiffs' Spread Pay Claims Are Neither Common Nor Typical of the
            Putative Class ......................................................................................................... 22

       B.   Individualized Inquiries Also Predominate For Plaintiffs' Spread Pay
            Claim ......................................................................................................................... 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

CASES

*Barenboim v. Starbucks Corp.*,
    2013 N.Y. LEXIS 1678, 2013 NY Slip Op 4754 (N.Y. June 26, 2013)...............12, 15, 16, 17

*Barenboim v. Starbucks Corp.*,
    698 F.3d 104 (2d Cir. 2012)..............................................................................................12

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426, 185 L. Ed. 2d 515 (2013) (*"Comcast"*)................................. passim

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)..............................................................................................20

*Gillian v. Starjem Rest. Corp.*,
    2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 4, 2011) ............................ passim

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)............................................................................................18

*Lujan v. Cabana Mgmt.*,
    284 F.R.D. 50 (E.D.N.Y. 2012) .....................................................................................13

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*,
    471 F.3d 24 (2d Cir. 2006)......................................................................................10, 24

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)..........................................................................................19

*Roach v. T.L. Cannon Corp.*,
    2013 U.S. Dist. LEXIS 45373 (N.D.N.Y Mar. 29, 2013)...........................20, 24, 25

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    359 F.3d 234 (2d Cir. 2011)............................................................................................12

*Teamsters Local 445 v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)............................................................................................10

*Wal-Mart Stores, Inc., v. Dukes*,
    131 S. Ct. 2541 (2011).........................................................................10, 11, 15, 18

*Wang v. Hearst Corp.*,
    2013 U.S. Dist. LEXIS 65869 (S.D.N.Y. May 8, 2013) .........................................22

# TABLE OF AUTHORITIES
## CONTINUED

**Page(s)**

**STATUTES**

FLSA ...................................................................................................................................... 2, 12

New York Labor Law ("NYLL") .......................................................................................... passim

**OTHER AUTHORITIES**

12 N.Y.C.R.R. § 146-2.14 ..................................................................................................... passim

Fed. R. Civ. P. 23 .................................................................................................................. passim

Defendant Starjem Restaurant Corporation, d/b/a Fresco by Scotto ("Fresco" or the "Restaurant") submits this memorandum of law in support of its opposition to Plaintiffs' Motion for Class Certification.

## PRELIMINARY STATEMENT

Named Plaintiff Ron Megason and opt-ins Marco Barrera, Claudia Rodriguez and Ann Zadoff (together, the "Plaintiffs") seek class certification of two of their New York Labor Law ("NYLL") claims against Fresco under Fed. R. Civ. P. 23(b)(3): (i) illegal retention of tips distributed to alleged managers and non-service employees (Plaintiffs' "tip pool claim") and (ii) failure to pay the spread-of-hours pay (Plaintiffs' "spread pay claim"). Plaintiffs' proposed class is defined to include Servers who worked for Fresco since February 21, 2006. (Pl. Br. at 1.[1])

Neither claim is appropriate for Rule 23 treatment, as they do not pose "common questions" that can be answered with "a single stroke." (Pl. Br. at 19.) For their tip pool claim, Plaintiffs allege that allowing "stockers," "expediters," and certain captains to participate in the tip pool violated NYLL § 196-d. But each of these four challenged participants poses a separate theory of liability under § 196-d, and their participation in the tip pool varied from shift to shift.[2] Accordingly, class members may be injured by one combination of tip pool participants on the lunch shift, yet share no common injury with Servers working the dinner shift on the same day, let alone for *every* shift worked since 2006. Similarly, liability on Plaintiffs' spread pay turns on whether, on any given day, the time between the beginning and end of a Server's workday exceeded ten (10) hours, and whether they received an extra hour of minimum wage for that day. Because both claims turn on facts particular to each Server, for each day that they worked,

---

[1] References to Plaintiffs' Memorandum of Law In Support of their Motion for Class Certification ("Plaintiffs' Motion"), Dkt. 52, are cited as "Pl. Br. at _." References to exhibits attached to the accompanying Declaration of Craig R. Benson dated July 29, 2013 ("Benson Dec.") are cited as "**Ex._**."

[2] In the vernacular of the restaurant industry, a single meal, be it lunch or dinner, is referred to as "a shift."

neither claim can be resolved on a class-wide basis.  Accordingly, Plaintiffs have not met their burden for establishing commonality under Rule 23(a)(2) for either claim.

Even if Plaintiffs could satisfy all of the prerequisites of Rule 23(a) (which they cannot), Plaintiffs' Motion is ultimately doomed because they cannot meet the exacting standards of Rule 23(b)(3).  Given that the makeup of the tip pool varied every day, a shift-by-shift analysis would be required to calculate the proportion of tips that were misdirected from Servers for *each* theory of liability asserted by Plaintiffs.  Plaintiffs' spread pay claim similarly requires an individualized analysis into whether each class member worked a 10-hour spread, and whether they were adequately compensated for that day.  Accordingly, individualized inquiries will predominate over class-wide ones.  For that reason, Plaintiffs failed to put forth any model for calculating damages on a class-wide basis, as required by the Supreme Court's recent decision in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013) ("*Comcast*").  Plaintiffs' Motion should therefore also be denied for their failure to satisfy Rule 23(b)(3).

## BACKGROUND AND PROCEDURAL HISTORY

On February 21, 2012, named Plaintiff Ron Megason ("Megason") commenced this action asserting claims for unpaid minimum wage and overtime under the FLSA and NYLL, as well as his tip pool and spread pay claims under the NYLL, on behalf of all Servers at Fresco.[3] (Dkt. 1, ¶¶ 10, 30-54.)  Previously, Plaintiffs' counsel filed an action asserting these same claims against Fresco on behalf of a proposed class that included "waiters/servers, bussers, runners, and bartenders."  *Gillian v. Starjem Rest. Corp.*, 2011 U.S. Dist. LEXIS 115833, at *1 (S.D.N.Y. Oct. 4, 2011).  Judge Rakoff denied the *Gillian* plaintiffs' Rule 23 motion seeking certification of their claims for unpaid wages because "the issue of whether Fresco's alleged [shift pay] rules

---

[3] On September 6, 2012, Megason amended his complaint to withdraw his allegations that Fresco's payment of shift pay did not fully compensate him and other putative class members for minimum wage and overtime.  (*See* Dkt. 18.)

violated the minimum wage and overtime [laws] depend[ed] on the number of hours each individual worked on a particular shift and the number of hours each individual worked in a particular week" and therefore, they did not present any questions of fact common to the class. *Id.* at \*19.  Judge Rakoff also declined to certify a Rule 23 class for the plaintiffs' tip pool claim, because they "utterly failed to demonstrate that they are similarly situated to other putative class members with respect to the legality of the tip pool."  *Id.*  The *Gillian* plaintiffs subsequently withdrew their individual claims against Fresco.[4]  (*See* Stip. Of Dismissal, No. 10-cv-06056-JSR (S.D.N.Y. Dec. 23, 2011), ECF No. 72.)

## STATEMENT OF FACTS

Fresco is a full-service Italian restaurant in midtown Manhattan open Monday through Friday for lunch and dinner, and open for dinner only on Saturdays.[5]  Anthony Scotto is Fresco's owner and general manager.[6]  He is the only person at Fresco authorized to hire, fire, and discipline employees,[7] or determine employees' terms and conditions of employment, including their number of shifts per week and rates of pay.[8]

### A.   Tip Pool Operation.

The tipped employees at Fresco pool their tips each shift.[9]  When there is a private party, the service charge charged to the party is also added to the tip pool.  The total amount of pooled

---

[4] The Parties agreed to incorporate portions of the *Gillian* record by reference, *i.e.*, the documents and testimony proffered by Defendant, and to exclude any "documents or sworn testimony provided by … the *Gillian* [plaintiffs]." (Dkt. 21, ¶¶ 1-2.)  The Parties' agreement was so-ordered by the Court on September 28, 2012.  (*Id.*)

[5] Declaration of Anthony Scotto dated July 29, 2013 ("Scotto Dec."), ¶ 4.

[6] Scotto Dec., ¶ 3; Declaration of Attilio Vosilla dated July 26, 2013 ("Vosilla Dec."), ¶ 3.

[7] Scotto Dec., ¶¶ 6, 7, 11-13; Vosilla Dec., ¶ 9; Declaration of Brent Drill dated July 29, 2013 ("Drill Dec."), ¶ 6.

[8] Scotto Dec., ¶¶ 6-8; Vosilla Dec., ¶¶ 9-12; Drill Dec. ¶¶ 6-7; Declaration of Natasha Gelman dated July 29, 2013 ("Gelman Dec."), ¶¶ 6-8.

[9] Drill Dec., ¶ 8; Scotto Dec. ¶ 17; *see also* Dkts. 54-60, ¶ 5 ("Fresco is a pooled house").  Tip pooling is a permissible practice under New York law.  *See* 12 N.Y.C.R.R. § 146-2.14(b) ("Tip pooling is the practice by which the tip earnings of directly tipped employees are intermingled in a common pool and then redistributed among directly and indirectly tipped employees.").

tips is re-distributed in accordance with the number of points linked to each service position: 1 point for floor and party Servers, .75 point for Runners (which sometimes includes the Runner assigned to assist with expediting, or the "Runner/Expeditor"), .6 point for the Coffee Man, .5 point for Busboys (including the Busboy assigned as the "Stocker"), and up to 1.5 points for the Floor Captain.[10]  The Servers in charge of the tip pool calculate each participant's portion by (i) adding the total number of points (by participant) for the shift; (ii) then dividing the total amount of pooled tips by the total number of participant points, which equals the value of one point; (iii) then multiplying the value of one point by each participant's designated point value.[11]  The proportion of tips paid out to Servers varies depending on the makeup of the entire tip pool on each shift, including the number of participants and their respective point designations, whereas the total dollar amount in the pool varies depending on how successful the shift was in terms of the tips received and services charges charged.  The Server divides up each person's distribution from the tip pool into envelopes and leaves a copy of the worksheet for the bookkeeper to process payroll.[12]  Management does not play any role in the operation of the tip pool.[13]

The Party Captain has never received a point share, or otherwise participated in the tip pool at Fresco.  Prior to June 2011, the Party Captain received 15% of the 20% service charge charged to parties before the remaining 85% was placed into the tip pool.  In June 2011, Fresco began charging parties a 17% service charge and a 3% administrative fee.  It is undisputed that

---

[10] Drill Dec., ¶¶ 9-10; *see also* **Ex. A** Tip Pool Sheets.  For the purposes of this Motion, Plaintiffs only challenge the participation of the following employees in the tip pool: (i) the Busser assigned to work as a Stocker, (ii) the Runner assigned as the Runner/Expediter, and (iii) Brent Drill (when he worked as Floor Captain prior to January 1, 2013). (Pl. Br. at 3-10.)

[11] Drill Dec., ¶ 12.  By way of example, for the lunch shift on September 16, 2013, there were 11 Servers (x 1 point = 11 points), 4 Runners (x 0.75 point = 3 points), 1 Coffee Man (0.6 point), 11 Busboys (x 0.5 point = 5.5 points) and 1 Floor Captain (1.5 points), for a total of 21.6 points in the pool.  (**Ex. A,** Tip Pool Sheets at DEF00276.) Dividing the total amount of pooled tips ($2,400) by the total number of points (21.6), each full point is valued at $111.00.  (*Id.*)  So, on this shift, each Server received $111.00 in tips, while Bussers received $55.00 in tips.

[12] Drill Dec., ¶ 12-13; Gelman Dec., ¶ 4.

[13] Drill Dec. ¶¶ 3, 14; Scotto Dec., ¶ 17.

the Party Captain receives the 3% administrative charge, and none of the 17% service charge, which is placed directly into the tip pool.[14]

### B. Job Duties of Challenged Tip Pool Participants.

Like many fine restaurants, employees at Fresco work collectively as a team to deliver quality service to guests. Clearly, tipped employees are incentivized to work together in order to obtain the most generous tips from customers, so that they have a bigger pool to split at the end of the shift. Each tipped employee benefits from the level of service that the other tipped employees provide. For that reason, the Captains, Servers, Runners and Busboys often share in performing the tasks necessary to provide guests with a pleasurable dining experience.

#### 1. Runner/Expediters.

Runners are responsible for delivering food from the kitchen to all of the sections in the Restaurant, including the private party room upstairs.[15] Fresco typically schedules two to three Runners every shift.[16] The Runners work together to ensure that food is served at the proper temperature and that guests receive their dishes simultaneously.[17] Runners wear black pants, black shoes, a yellow shirt, a gold tie, and an apron.[18]

If Fresco is expected to be extremely busy, sometimes a fourth Runner is scheduled.[19] For those shifts, the most senior Runner will work as the "Lead Runner," and assist the sous chef

---

[14] Scotto Dec., ¶ 16; Vosilla Dec., ¶ 6; Drill Dec., ¶ 9. Although Plaintiffs attempt to characterize Mr. Vosilla as a tip pool participant (Pl. Br. at 3-6), he never received any distributions *from* the tip pool. Rather, prior to June 2011, if there was a private party during a dinner shift, and he worked as a Party Captain, then he received 15% of the 20% service charge charged to the party before the remainder was added to the tip pool. (Vosilla Dec., ¶¶ 5-6, 8; Scotto Dec., ¶ 16; Drill Dec., ¶ 9; *see also* Dkts. 54-59 & 60, ¶ 5 (describing the addition of private party gratuities to the tip pool)).

[15] Scotto Dec., ¶ 19; **Ex. B**, Excerpts from the Deposition of Klever Dutan taken on June 12, 2013 ("Dutan Dep.") at 36:8-19, 43:14–44:22; **Ex. C**, Excerpts from the Deposition of Krzystof Cielecki taken on June 13, 2013 ("Cielecki Dep.") at 46:3-10.

[16] Scotto Dec., ¶ 18; Vosilla Dec., ¶ 14; **Ex. B**, Dutan Dep. at 16:22–17:11, 33:4-10.

[17] **Ex. B**, Dutan Dep. at 33:4-10, 34:4-7, 34:13-22, 35:10-20, 42:6–43:13, 52:20–53:9.

[18] Scotto Dec., ¶ 22; **Ex. B**, Dutan Dep. at 13:5-13; **Ex. C**, Cielecki Dep. at 15:6-24.

[19] Scotto Dec., ¶ 20; Vosilla Dec., ¶ 14; **Ex. B**, Dutan Dep. at 52:20–53:3, 57:18–58:4.

by coordinating the delivery of food to larger tables.[20]  The reason this assignment is sometimes referred to as the Runner/Expediter is because the Lead Runner stands next to the sous chef, who works at the expeditor station.[21]  Notwithstanding this additional responsibility, the primary duty of the Runner/Expediter remains the same as the other Runners — to bring food from the kitchen to customers' tables throughout the shift.[22]  To the extent he spends more time in the kitchen than the other Runners, it is only during the dinner rush, which lasts no more than an hour.[23]

Occasionally, if the sous chef calls in sick, Mr. Scotto may assign a Runner to fill in to perform traditional "expeditor" functions.[24]  On these occasions, the Runner assigned to fill this role will not leave the kitchen.  However, he will not participate in the tip pool for the shift and instead, will receive a separate paycheck from Fresco.[25]

### 2.  Busboys/Stockers.

Busboys are assigned to different sections throughout the dining room.  They are responsible for clearing and re-setting tables with clean items from the side stations, bringing dirty dishes back to the kitchen, re-filling water glasses, and assisting the waiters in attending to guest requests.[26]  They are also responsible for assisting Runners deliver bread and other food from the kitchen to larger parties.[27]

Most shifts, Fresco assigns a Busboy to work the Coffee Station or the Stocking Station.

---

[20] Scotto Dec., ¶ 20; Vosilla Dec., ¶ 14; **Ex. B**, Dutan Dep. at 52:15–53:9.

[21] Scotto Dec., ¶ 20.

[22] Scotto Dec., ¶ 20; Vosilla Dec., ¶ 14; **Ex. B**, Dutan Dep. at 53:18–54:55:2.

[23] **Ex. B**, Dutan Dep. at 53:18–55:3.

[24] Scotto Dec., ¶ 22; **Ex. B**, Dutan Dep. at 58:5–59:14.

[25] **Ex. B**, Dutan Dep. at 58:10–59:5, 65:18–67:22; Scotto Dec., ¶ 21; Gelman Dec., ¶ 7.

[26] **Ex. C**, Cielecki Dep. at 32:21-22, 37:8–39:21, 41:13–42:23; Scotto Dec., ¶ 23; **Ex. D**, Deposition of Ann Zadoff taken on June 7, 2013 ("Zadoff Dep.") at 78:10-18.  Side stations are cabinets in the dining room that hold the clean silverware and dishes.  Scotto Dec., ¶ 23.

[27] **Ex. C**, Cielecki Dep. at 11:7-10 34:10-15; 35:19–36:9, 46:11-22, 48:18–49:2, 49:10-16; **Ex. B,** Dutan Dep. at 25:19-22, 26:5-7, 42:14-22, 62:10-15; Scotto Dec., ¶ 23; **Ex. D**, Zadoff Dep. at 53:11-19, 58:7-15.

These assignments are rotated among the Busboys.[28]   Sometimes, depending on the guest volume, there may be one Busboy assigned to both stations.[29]   All Busboys (including the Stocker and Coffee Man) wear the same uniforms as the Runners.[30]

The Stocker's duties are geared towards serving all customers.  The Stocker is in charge of ensuring that the side stations are adequately stocked with clean dishes and silverware at all times.[31]   There are three side stations located in the main dining room, and one located upstairs in the private party.[32]   Unlike the other Busboys (who are assigned to a specific section of the Restaurant) or the Coffee Man (who is assigned to the coffee station), the Stocker services the entire restaurant.[33]   His service ensures that Busboys and Servers can quickly re-set the tables  in their sections between courses and seatings, or just bring clean dishware and glassware to guests, without having to go back to the kitchen to get these items.[34]

While the Stocker is in charge of replenishing all of the side stations, he is still responsible for performing his other Busboy duties, like clearing tables, bringing dirty dishes and silverware back to the kitchen, refilling water glasses, and running bread and food.[35]   All Busboys, regardless of their assignments, are responsible for working together as a team to ensure that service goes smoothly during any given shift.[36]   Thus, Busboys will often assist the

---

[28] Scotto Dec., ¶ 22; Vosilla Dec. ¶ 13; **Ex. C**, Cielecki Dep. at 18:1-3, 21:23–22:4; **Ex. B,** Dutan Dep. at 60:14–61:2.

[29] Scotto Dec. ¶ 22; **Ex. B,** Dutan Dep. at 30:4–15; **Ex. C**, Cielecki Dep. at 22:17-22; *see also* **Ex. D**, Zadoff Dep. at 115:10-20 ("If it's very slow… the busboys or some people do double duty.").

[30] Scotto Dec., ¶ 22; **Ex. C**, Cielecki Dep. at 15:6-24; **Ex. B**, Dutan Dep. at 13:5-13, 61:3-4.

[31] **Ex. C**, Cielecki Dep. at 20:19–21:22; **Ex. B**, Dutan Dep. at 60:1-18; Scotto Dec., ¶ 23; Vosilla Dec., ¶ 13.

[32] **Ex. C**, Cielecki Dep. at 19:24–20:18, 50:1-6; **Ex. B**, Dutan Dep. at 60:5-13.

[33] **Ex. C**, Cielecki Dep. at 43:22–44:14.

[34] **Ex. C**, Cielecki Dep. at 21:13-22, 36:3-21, 38:10-20; *see also* **Ex. D**, Zadoff Dep. at 115:21–116:23.

[35] **Ex. C**, Cielecki Dep. at 35:19–36:9, 48:18–49:2, 49:17–50:6, 51:23–52:5, 54:10–55:8, 56:15–57:8; **Ex. B,** Dutan Dep. at 64:4-7.

[36] **Ex. C**, Cielecki Dep. at 53:22–54:9 ("[E]verybody works for one customer"); *id.* at 35:2-8, 52:9–53:8, 63:1-18,

Stocker in restocking the side stations and the Stocker will still clears and resets tables.[37]  When the Runners have large parties and need assistance — all of the Busboys, including the Stocker, assist in delivering food to guests.[38]

### 3. Floor Captains.

The primary duty of all Floor Captains is to make sure that guests receive great service.[39] To this end, Floor Captains perform many of the same tasks as the Servers; namely, telling customers the specials, taking food and drink orders, clearing tables, helping with wine sales, and ensuring general customer satisfaction.[40]  As opposed to Servers, Floor Captains serve customers throughout the entire dining room, not just in one section.[41]

Brent Drill participated in the tip pool as a Floor Captain until January 1, 2013, when he was promoted to manager.[42]  As Floor Captain, Mr. Drill performed the same service functions as other individuals who worked in this role, including opt-in Marco Barrera, Peter Bretz, and Chuck Tussin.[43]  Like the other Floor Captains, Mr. Drill never had the authority to hire, fire, or discipline employees; nor did he have the power to set employees' terms and conditions of employment, including their schedule or rates of pay.[44]

### 4. Party Captains.

---

see also **Ex. B,** Dutan Dep. at 24:12-23; 26:8–27:2 (Runners pitch in to help Bussers); **Ex. E**, Excerpts from the Deposition of Marco Barrera taken on June 4, 2013 ("Barrera Dep."), at 102:2–103:23 (the job of all Bussers, Runners and Servers is to help out during service as necessary).

[37] **Ex. C**, Cielecki Dep. at 19:18-23, 22:5-10, 43:10-21, 59:14–61:2; **Ex. B,** Dutan Dep. at 61:11–62:18.

[38] **Ex. C**, Cielecki Dep. at 46:11-22, 48:18–49:2, 49:17–50:6; **Ex. B**, Dutan Dep. at 35:21–36:13, 40:14–41:9, 52:14–53:7, 62:10-15; Scotto Dec., ¶ 23.

[39] **Ex. E**, Barrera Dep. at 13:17–14:7, 29:23–30:5; Drill Dec., ¶ 5.

[40] Drill Dec., ¶ 5; **Ex. E**, Barrera Dep. at 15:1-20, 44:3-8; see also **Ex. B,** Dutan Dep. at 25:9-11.

[41] **Ex. E**, Barrera Dep. at 14:8–15:20; Drill Dec., ¶ 5.

[42] Drill Dec., ¶ 3.  It is undisputed that Mr. Drill has not participated in the tip pool since he was promoted to manager.  (See Dkts. 55, 56, 58, ¶ 24, Dkt. 60, ¶ 23.)

[43] Drill Dec., ¶ 5; Scotto Dec., ¶ 14; **Ex. E**, Barrera Dep. at15:13-24, 29:13–30:5; **Ex. D**, Zadoff Dep. at 52:20-24, 61:13–62:24.

[44] Drill Dec., ¶ 6-7; Scotto Dec., ¶¶ 6-8, 11-13.

For private parties, Mr. Scotto assigns a Party Captain to the event.[45] This Party Captain is ultimately responsible for making sure that the party guests' needs are met and that service is top-notch.[46] The Party Captain, among other things, greets the host; helps takes food, wine and drink orders; coordinates with the kitchen on the entire party's order; explains the wine list; pours wine; helps plate and deliver food; checks in with guests periodically throughout their meal; remains present at the party and presents the bill for payment.[47]

Because there is not a private party every day, there is not a Party Captain on every shift.[48] Over time, Mr. Scotto has assigned various individuals, including Attilio Vosilla, Peter Bretz, opt-in Marco Barrera, Desaree Demarie or Chuck Tussin to serve as Party Captains.[49] Party Captains, including Mr. Vosilla, do not have the authority to hire, fire, or discipline employees, nor do they have the power to set employees' terms and conditions of employment.[50] Party Captains have never received distributions from the tip pool at Fresco.[51]

## ARGUMENT

## I.     THE STANDARD FOR CERTIFYING A RULE 23 CLASS

Because class actions are the "exception to the usual rule" of conducting litigation only on behalf of named parties, Plaintiffs must first prove their compliance with the (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation prerequisites under Rule 23(a). *Comcast*, 133 S. Ct. at 1432. The Court must "probe behind the pleadings" and perform "a rigorous analysis" of Plaintiffs' evidence to decide whether each element of Rule 23(a) is

---

[45] Scotto Dec., ¶ 14; Vosilla Dec., ¶ 7.

[46] Scotto Dec., ¶ 14; Vosilla Dec., ¶ 7; **Ex. E**, Barrera Dep. at 45:4-23.

[47] Scotto Dec., ¶ 14; Vosilla Dec., ¶ 7.

[48] Vosilla Dec., ¶ 4; Drill Dec., ¶ 11.

[49] Scotto Dec., ¶ 15; Vosilla Dec., ¶ 4; **Ex. E**, Barrera Dep. at 44:19-20. Many of these individuals also worked as Servers, Bartenders, and/or Floor Captains. Scotto Dec., ¶ 15; *see generally* **Ex. E**, Barrera Dep.

[50] Scotto Dec., ¶¶ 7-8; Vosilla Dec., ¶¶ 9-12; Drill Dec., ¶¶ 6-7.

[51] Scotto Dec., ¶ 16; Vosilla Dec., ¶ 5; Drill Dec., ¶ 10.

satisfied.  *Id*. (internal citations omitted).   In addition, Plaintiffs "must also satisfy *through evidentiary proof* at least one of the provisions of Rule 23(b)."  *Id.* (emphasis supplied). Although the "same analytical principles govern Rule 23(b) … Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."  *Id.* (internal citations omitted).

In the Second Circuit, a plaintiff must satisfy each Rule 23 requirement by a preponderance of the evidence.  *Teamsters Local 445 v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (internal citations omitted) (emphasis added).   The Court "must receive enough evidence, by affidavits, documents, or testimony to be satisfied that" each Rule 23 requirement is met.  *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir. 2006) ("*In re IPO*").   The Court must "resolve[] factual disputes relevant to each Rule 23 requirement … [to be] persuaded to rule … that [each] requirement is met" notwithstanding if any merits issue "is identical [to one or more] Rule 23 requirement."  *Teamsters Local 445*, 546 F.3d at 202 (citing *In Re IPO*, 471 F.3d at 41).

## II.     PLAINTIFFS' TIP POOL CLAIM IS NOT SUITED FOR CLASS TREATMENT

### A.     Plaintiffs Cannot Establish Commonality Under Rule 23(a)(2)

Plaintiffs question whether Fresco's tip pool practices were "uniformly applied to all Class Members" and whether distributing a portion of tips to "Attillio Vasivotto [*sic*], Manager Brent Drill, expediters and stockers was unlawful."  (Pl. Br. at 14.)   These questions cannot "generate [the] common *answers* apt to drive the resolution of the litigation" necessary to establish commonality under Rule 23(a)(2).  *Wal-Mart Stores, Inc., v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("*Dukes*") (merely "[r]eciting [common questions that parrot a class action complaint] is not sufficient to obtain class certification.").   Rather, Plaintiffs must propose a "common contention" whose "truth or falsity will resolve an issue central to the validity of each

10.

one of the [class members'] claims in one stroke." *Id.* (emphasis in original).

Plaintiffs contend that all class members suffered the same injury by virtue of their participation in one tip pool.  (Pl. Br. at 14-15.)  But § 196-d is a statute that "can be violated in many ways." *Dukes*, 131 S. Ct. at 2551.  Here, Plaintiffs have asserted four separate theories of liability that do not add up to a single "common wrong" shared by the class.  (Pl. Br. at 15.)  Determining *whether* class members were injured by the tip pool depends on the other participants during every shift: (i) *if* there was a Stocker on duty (less likely if reservations were low), *whether* he performed enough customer service for that shift to participate in that shift's tip pool; and/or (ii) *if* there were four Runners on duty (more likely if reservations were high) *and* one of the four was a Lead Runner/Expediter who received tips (rather than being paid by the house), *whether* his primary duty was running food for that shift; and/or (iii) *if* Brent Drill participated in the tip pool as Floor Captain (which he did not do on Saturdays or Mondays when he closed the restaurants), *whether* his supervisory duties disqualified him from receiving tips; and/or (iv) *if* there was a private party, *and* Attilio Vosilla was assigned as Party Captain (which could have only occurred Tuesdays through Saturdays for dinner), *and* he received a portion of the service charge (rather than an administrative fee), *whether* his supervisory duties disqualified him from receiving the service charge.  Given that the combination of alleged (and fully contested) violations could change each shift, any *one* of Plaintiffs' unlawful tip pool theories — let alone all four — simply cannot "be productively litigated at once." *Dukes*, 131 S. Ct. at 2551.  There is no commonality with respect to any of these questions.

### 1.   Plaintiffs' Evidence on the Actual Duties Performed by Stockers and Expediters Is Insufficient

The question of whether the Stocker and Expediter assignments can participate in the tip pool for a certain shift turns on whether the individuals assigned to these roles performed

sufficient customer service duties to qualify as a waiter or "busboy or similar employee" under NYLL § 196-d.  12 N.Y.C.R.R. §§ 146-2.14(e)(1), (3), (6)-(7) (explaining that tip "[e]ligible employees must perform, *or assist in performing*, personal service to patrons at a level that is a principal and regular part of their duties" and listing wait staff, bus persons, barbacks, and food runners as examples) (emphasis supplied).[52]

As an initial matter, Plaintiffs cannot fulfill their evidentiary burden by simply citing to the *Gillian* decision.  (*See* Pl. Br. at 8-9.[53])  The evidence regarding the nature of the Stocker and Expediter assignments "adduced" by the *Gillian* plaintiffs was specifically *excluded* from the record in the instant case.  (*See* Dkt. 21, ¶¶ 1-2.)  Thus, Plaintiffs' only evidence regarding the alleged lack of customer service provided by Stockers and Expediters are the virtually identical accounts set forth in their declarations.  (*See generally* Dkts. 54-60.)  Plaintiffs' conclusory allegations, including, but not limited to, statements such as "Stockers did not provide direct

---

[52] Plaintiffs' reliance on cases regarding the legality of tip pool practices under the FLSA (*see* Pls. Br. at 8-11) is misplaced.  While tip pool practices that violate the FLSA *may* also violate § 196-d (*see* Pl. Br. at 8, n.22), the Second Circuit has clarified that its decision in *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 241 (2d Cir. 2011) "was made in the context of deciding that § 196-d and the FLSA share a common aim and should be construed in the same manner" for the purposes of determining whether both claims can be maintained in a "hybrid" class/collective action involving opt-in and opt-out procedures.  *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 111 (2d Cir. 2012); *see also Shahriar*, 659 F.3d at 244-45 (explaining that plaintiff's NYLL and FLSA claims arose out of the same facts).  Accordingly, the cases cited by Plaintiffs fail to set forth the correct legal standard for establishing commonality regarding their § 196-d claims for purposes of their Rule 23 motion.  Indeed, the Second Circuit made clear that Courts will be "bound to apply the Hospitality Wage Order" in the event it is found to be "a permissible interpretation of § 196-d."  *Barenboim*, 698 F.3d at 112 (certifying questions regarding the validity of the Wage Order to the New York State Court of Appeals).  Since the Court of Appeals has now answered this question in the affirmative, the Wage Order therefore governs Plaintiffs' § 196-d claim.  *Barenboim v. Starbucks Corp.*, 2013 N.Y. LEXIS 1678, at *12-13, 2013 NY Slip Op 4754 (N.Y. June 26, 2013)

[53] Plaintiffs also attempt to mischaracterize the *Gillian* court's decision.  Judge Rakoff did not rule that "there was sufficient evidence that Fresco's stockers and expediters did not provide direct customer service," nor did he decide that these individuals were "ineligible" tip pool participants, as Plaintiffs contend.  (Pls. Br. at 8-9.)  Rather, in denying Defendant's motion for summary judgment, the *Gillian* court found that the extent of their customer interaction was a triable issue of fact.  2011 U.S. Dist. LEXIS 115833, at *17; *see also id.* at *15 n.7 (observing that the record before the court lacked deposition testimony from "those individuals who actually served as stockers and expediters [who] would be in the best position to describe their job responsibilities.").

customer service"[54] and "Expediters generally spent their entire shift in the kitchen"[55] — should

not be credited by the Court.  *See Lujan v. Cabana Mgmt.*, 284 F.R.D. 50, 63 (E.D.N.Y. 2012)

(explaining that "flaw[ed]" declarations that contain "conclusory or cookie-cutter statements" are

to be accorded less weight in deciding a Rule 23 motion).  Moreover, four of the declarants

admitted during depositions that Servers lack sufficient personal knowledge to attest to the

primary duties of Stockers and Expediters, given that they (i) seldom entered the kitchen  (ii) did

not know whether the Busser who was assigned as Stocker was the same person who performed

Stocker duties during that shift; (iii) did not know which Runner, if any, was assisting the kitchen

expedite on any given shift; and/or (iv) did not see who was running food to the other sections on

the main floor or to the private rooms upstairs (*i.e.*, whether they were Bussers, Stockers,

Runners or Expediters).[56]

    While Plaintiffs now purport to know how much time each Runner and Busser spends in

the dining room each shift, they neglect to identify *which* Expediters or Stockers *never* served

customers, or specify how often these individuals participated in the tip pool beyond "regularly"

or "for some shifts."  (*See generally* Dkts. 54-60.)  In contrast to the *Gillian* case, "individuals

who actually served as stockers and expediters [and therefore] in the best position to describe

their job responsibilities" were deposed here.  2011 U.S. Dist. LEXIS 115833 at *15 n.7.  Klever

---

[54] Dkt. 54, Megason Dec. ¶ 12; Dkt. 55, Barrera  Dec. ¶ 13; Dkt. 56, Broderick Dec. ¶ 14; Dkt. 58, Perry Dec. ¶ 13; Dkt. 59, Rodriguez Dec. ¶ 14; Dkt. 56, Zadoff Dec. ¶ 13.  The Declaration of opt-in Marci Koltonuk dated June 13, 2013 (Dkt. 57) contains no allegations with respect to Stockers.

[55] Dkt. 54, Megason Dec. ¶ 17; Dkt. 55, Barrera  Dec. ¶ 18; Dkt. 56, Broderick Dec. ¶ 18; Dkt. 57, Koltonuk Dec. ¶ 17; Dkt. 58, Perry Dec. ¶ 18; Dkt. 56, Zadoff Dec. ¶ 18.  *See also* Dkt. 59, Rodriguez Dec. ¶ 59 ("Throughout their shift, expediters worked in the kitchen.").

[56] **Ex. F**, Excerpts from the Deposition of Ron Megason taken on October 26, 2012 ("Megason Dep.") at  65:8–71:5, 78:9-23, 86:10–87:6; **Ex. G**, Excerpts from the Deposition of Claudia Rodriguez taken on November 14, 2012 ("Rodriguez Dep.") at 131:5-22, 141:12–144:4, 148:11–151:20, 155:21–157:2; **Ex. E**, Barrera Dep. at 72:1-24, 95:1–96:2; **Ex. D**, Zadoff Dep. at 72:2–73:23, 77:15–78:23, 107:16–110:22, 114:22–116:18; *id.* at 119:2–120:3 ("there are all of these yellow shirts … it's a mumble-jumble in the kitchen so … I don't really know.  I don't know who are runners, or performing expediter duties.  I don't know if the expediters are performing running duties, because I don't really know what goes on in the kitchen.").

Dutan (a Runner) and Krzysztof Cielecki (a Busser) contradicted Plaintiffs' conclusory statements in several material respects:

- The primary duty of Runner/Expediter and Busboy/Stocker is to serve customers.[57]  Runners and Bussers work as a team with the Servers to make sure that service runs smoothly at all times, even when assigned as an Expediter or Stocker;[58]

- Because the Stocker and Expediter assignments are rotated, the level of *direct* customer service some might provide will vary depending on the individuals assigned (as some people were better team players than others) and how busy Fresco is during any given shift;[59]

- Expediter" is a misnomer: on shifts with four Runners (typically during the holidays), the "lead" Runner is designated to assist the sous chef coordinate the dishes before they are run. For those shifts, the Lead Runner spends no more than one hour in the kitchen; he spends the rest of his shift running food, which is his primary duty;[60]

- For shifts where a Runner is asked to fill in for the sous chef and help expedite, he does not participate in the tip pool, and receives a separate paycheck from Fresco for that shift;[61] and

- The Bussers "all serve one customer."  This means that Stockers regularly perform Busser duties, and Bussers perform Stocker duties.  It is the Stocker's duty to help the other Bussers run bread, clear tables, and run food for large parties.  It is also the Bussers' duty to help restock the stations when they see that the Stocker is busy.[62]

Not only does this testimony contradict the conclusory allegations in Plaintiffs' declarations, it supports Defendant's position that both the Stocker and the Expediter provide sufficient customer service to be proper tip pool participants under § 196-d.[63]  Accordingly, the question of

---

[57] **Ex. B**, Dutan Dep. at 53:18–55:2, 64:4-7; **Ex. C**, Cielecki Dep. at 35:19–36:9, 48:18–49:2, 49:17–50:6, 51:23–52:5; 54:10–55:8, 56:15–57:8.

[58] **Ex. B**, Dutan Dep. at 35:21–36:13, 40:14–41:9, 52:14–43:7, 61:11–62:18; **Ex. C**, Cielecki Dep. at 19:18-23, 22:5-10, 43:10-21, 46:11-22, 48:18–49:2, 49:17–50:6, 59:14–61:2.

[59] **Ex. B**, Dutan Dep. at 40:14–41:19; **Ex. C**, Cielecki Dep. at 58:9-23.

[60] **Ex. B**, Dutan Dep. at 52:15–53:9, 53:18–55:3, 57:18–58:4.

[61] **Ex. B**, Dutan Dep. at 58:5–59:14.

[62] **Ex. C**, Cielecki Dep. at 19:18-23, 22:5-10, 35:19–36:9, 35:24–36:9, 43:10-21, 46:11-22, 48:18–49:2, 49:17–50:6, 51:23–52:5, 53:22–55:8, 56:15–57:8, 59:14–61:2, 63:1-18; *see also* **Ex. B**, Dutan Dep. at 24:12-23; 26:8–27:2, 24:12-23, 26:8–27:2, 35:21–36:13, 40:14–41:9, 52:14–53:7, 61:11–62:18, 64:4-7.

[63] Even if the Bussers who are assigned to Stockers did not have *direct* customer interaction, which they do, they would nevertheless be eligible to participate in the tip pool for that shift.  The Wage Order makes clear that *direct* customer interaction is not necessary in order to receive tips under § 196-d.  Indeed, the Wage Order merely requires

whether one of them are tip eligible is not one capable of "generating common *answers*" under *Dukes*, because the actual duties performed by the Busboy and Runner assigned to those roles will vary shift-by-shift, depending on the volume of business in Fresco, and how customer- (or team-) oriented the individual is on that shift.[64]   131 S. Ct. at 2551 (emphasis in original). Accordingly, Plaintiffs have not established commonality with respect to these two tip pool violation theories for the purposes of Rule 23(a)(2).

### 2. Plaintiffs Have Failed to Establish that Messrs. Vosilla and Drill are Ineligible to Receive Tips Under § 196-d

Plaintiffs also mischaracterize the *Gillian* court's discussion of evidence pertaining to supervisory duties performed by Mr. Vosilla and Mr. Drill.  (Pl. Br. at 4-5.)  In reality, Judge Rakoff concluded that the "contradictory" evidence on the scope of their managerial authority presented triable issues of fact for summary judgment purposes, and that it "was far from clear" whether Mr. Vosilla could participate in the tip pool based on then-existing case law interpreting § 196-d.  *Gillian*, 2011 U.S. Dist. LEXIS 115833, at *13-14.

The Court of Appeals has since clarified that "an employee whose personal service to patrons is a principal or regular part of his … duties may [lawfully] participate [in a tip pool under] § 196-d, *even if* that employee possesses limited supervisory responsibilities." *Barenboim*, 2013 N.Y. LEXIS 1678, at *17 (emphasis added); *see also* 12 N.Y.C.R.R. § 146-2.14(e)(8) (including "captains who provide direct food service to customers" in the list of examples of tip-eligible occupations).  However, where "the degree of managerial responsibility

---

that the employee "perform, *or assist in performing*, personal service to patrons."  It then lists barbacks among the employees who are tip eligible.  There is no disputing that barbacks do not have *direct* customer interaction.  Their primary duty is to stock the bar with clean dishware, glassware, ice and liquor so that the bartender does not have to go into the kitchen or stock room to retrieve those items.  Even accepting Plaintiffs' allegations concerning the Stocker as true, the Stocker provides the identical *assistance* to the Servers and Bussers that barbacks provide to bartenders, and therefore meet the requirements to share in tips under § 196-d.

[64] **Ex. E**, Barrera Dep. at 98:21–103:23; **Ex. B**, Dutan Dep. at 49:13-18, 50:23–51:3; **Ex. C**; Cielecki Dep. at 58:9-23.

15.

becomes so substantial that an individual can no longer fairly be characterized as an employee similar to general waitstaff within the meaning of … § 196-d" such employees is not eligible to participate in a tip pool. *Barenboim*, 2013 N.Y. LEXIS 1678, at *16-17.  The Court of Appeals held that the dividing line falls at "meaningful or significant authority over subordinates." *Id.* The Court noted that examples of such authority may include (i) disciplining subordinates, (ii) assisting in performance evaluations, (iii) participating in hiring or firing, or (iv) creating schedules, which all indicate the ability to "*directly* influenc[e] the number and timing of hours worked by staff as well as their compensation." *Id.* (emphasis added).

Here, it is undisputed that the primary duty of Party Captains is providing personal service to guests at private events.[65]  Plaintiffs have failed to establish that Mr. Vosilla's role in overseeing service disqualified him from receiving tips as Party Captain.  Most of the "supervisory" functions Plaintiffs cite to, *e.g.*, voiding items on customer checks, holding pre-shift meetings, dealing with customer complaints, and overseeing end-of-shift duties (*see generally* Dkts. 54-60) do not denote "meaningful authority" over potential class members, as they are not indicative of Mr. Vosilla "directly influencing" the number of hours class members worked or how much they were paid.  *Barenboim*, 2013 N.Y. LEXIS 1678, at *16.  Although Plaintiffs claim that Mr. Vosilla interviewed, hired, disciplined and terminated employees (Pl. Br. at 6), this assertion is not supported by the evidence they cite, which consists primarily of the same self-serving, conclusory allegation in their declarations.[66]  Furthermore, the deposition testimony cited by Plaintiffs establishes only that Mr. Vosilla (i) was responsible for the

---

[65] *See, e.g.*, **Ex. E**, Barrera Dep. at 44:24–46:10, 63:3-21 (testifying that Marco Barrera, Peter Bretz, Brent Drill and Attilio Vosilla all worked as Party Captains and that Mr. Vosilla provided the same tip-producing service to customers as the other individuals who worked in this role); **Ex. D**, Zadoff Dep. at 93:1-6, 106:1–107:14 (agreeing that Mr. Vosilla provides service to customers as Party Captain).

[66] *See* Pl. Br. n.16 at 6 (citing to paragraphs in Plaintiffs' declarations alleging that "Mr. Vosilla supervised and directed the tipped employees on the floor, reprimanded employees when they acted improperly, and monitored that employees performed their end-of-dinner-shift duties.").

administrative function of preparing the weekly schedule for Mr. Scotto's review, and that (ii) the only "disciplinary authority" he ever exercised was directing staff regarding service to customers, and reminding them not to use their cell phones while on the floor — just as a Floor Captain would do.[67]   Indeed, opt-in Marco Barrera testified that directing waitstaff on service is an inherent aspect of a Captain's responsibility — something he also did when he worked as a Captain.[68]   Accordingly, Plaintiffs have failed to establish that Mr. Vosilla's supervisory duties exceeded the "meaningful authority" standard.

Similarly, Plaintiffs do not dispute that Mr. Drill's primary duty when he worked as Floor Captain was providing service to customers in the main dining room and functioning as Fresco's wine steward.[69]   Indeed, Mr. Barrera testified that Mr. Drill was "fantastic" at wine sales, a skill that directly benefitted all tip pool participants.[70]   Plaintiffs' declarations do not establish that Mr. Drill's authority over wait staff as Floor Captain "render[ed]" him so "dissimilar to waiters and busboys so as to preclude [his] participation in [Fresco's] tip pools." *Barenboim*, 2013 N.Y. LEXIS 1678, at *14.   To begin with, it is undisputed that *all* Floor Captains directed tipped employees on how to properly perform their jobs during service.[71]   Plaintiffs' other self-serving allegations regarding Mr. Drill's authority are simply not supported

---

[67] *See* Dkt. 53, Weiner Dec., Ex. B at 36:21-23, 37:21-24; *id.* Ex. C at 18:7-25, 55:16-23.

[68] **Ex. E**, Barrera Dep. at 14:5–15:24, 19:15–20:09, 22:7–23:15, 29:23–30:05, 44:19–45:23.

[69] **Ex. E**, Barrera Dep. at 14:4-7, 15:13-24; *id.* at 29:13–30:5 ("Q: As a captain, would you agree that the main aspect of your job is to provide personal service to the customers? A: That is correct. Q: And that would be true with respect to Brent as well, when he was a captain; correct? A: Yes.); *see also* **Ex. F**, Megason Dep. at 42:16–45:3; **Ex. D**, Zadoff Dep. at 51:11-18, 60:6–63:12.

[70] **Ex. E**, Barrera Dep. at 44:9-18 (testifying that Mr. Drill's "wine sales definitely help[ed]" the servers in the tip pool).

[71] *Compare* Dkt. 54, Megason Dec. ¶ 23, Dkt. 55, Barrera Dec. ¶ 31, Dkt. 58, Perry Dec. ¶ 25 ("Amongst his many duties, Mr. Drill supervises and directs the servers and other tipped employees on the floor") *with* **Ex. E**, Barrera Dep. at 19:5–20:9 (admitting that all captains directed employees on how to do their jobs properly during service and that both he and Mr. Drill would direct servers or bussers on service if he noticed that they were doing something wrong); *see also id.* at 22:3–23:15 (admitting that the only disciplinary authority Mr. Drill exercised was directing employees on how to do their job, which is something that all captains did).

17.

by the record.  For instance, despite claiming to have personal knowledge regarding employees allegedly hired or fired by Mr. Drill, several declarants testified that their knowledge was based on no more than "hearsay," rumor, and speculation.[72]  In fact, Mr. Barrera admitted that Mr. Drill could not take *any* action in Fresco without obtaining Mr. Scotto's approval, and that he also escalated issues regarding wait staff to Mr. Scotto when he served as Floor Captain, which is entirely consistent with *Defendant's* evidence.[73]

Thus, the only evidence of the managerial duties that allegedly disqualify Mr. Vosilla and Mr. Drill from receiving tips consists of Plaintiffs' own declarations.  But Plaintiffs' subjective beliefs alone do not establish that Mr. Vosilla or Mr. Drill wielded "meaningful authority" over the proposed class members.  *See Dukes*, 131 S. Ct. at 2251 ("Rule 23 does not set forth a mere pleading standard.  A party … must be prepared to prove that there are *in fact* … common questions of law or fact") (emphasis in original).  Accordingly, Plaintiffs have not met their burden for establishing commonality with respect to these two tip pool violation theories either.

### B.  Marco Barrera Is An Inadequate Class Representative Under Rule 23(a)(4)

Plaintiffs claim that, in addition to Mr. Megason, opt-ins "Marco Barrara [*sic*], Claudia Rodriguez and Ann Zadoff are prepared to act as class representatives, have no conflict with any class members, and will fairly and adequately protect the interests of the class."  (Pl. Br. at 17.)  However, Rule 23(a)(4) requires that Plaintiffs establish that class members do not have any interests that are "antagonistic" to one another.  *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).  Yet here, there is evidence that Plaintiffs' interests with respect to

---

[72] *Compare* Dkt. 54, Megason Dec. ¶ 26 ("To my knowledge, Mr. Drill hired servers.") *with* **Ex. F**, Megason Dep. at 17:10-15 ("Q: So you have no personal knowledge as to the circumstances of her hire, correct? … A: I have hearsay."), *id.* at 17:24–18:20.); *see also* Dkt. 55, Barrera Dec. ¶ 30 ("I know that other servers were hired and fired by Mr. Drill); Dkt. 59, Rodriguez Dec. ¶ 28 (same); **Ex. E**, Barrera Dep. at 108:9-12, 110:22–111:4, 118:2–123:11; **Ex. G**, Rodriguez Dep. at 103:1–16, 111:6–113:4.

[73] **Ex. E**, Barrera Dep. at 120:3–122:11, 127:6-20; *see also* Scotto Dec. ¶¶ 6-13; Drill Dec. ¶ 6-7.

the tip pool are not aligned with Mr. Barrera's interests for the shifts he served as a Floor Captain.   Mr. Barrera testified that during those shifts, he performed many of the *same* supervisory functions as Mr. Drill, such as directing wait staff on performing their duties during service.[74]  (Pl. Br. at 5-6.)  But, Mr. Megason testified that he believed "anyone wearing a suit," *i.e.*, a Captain, had the authority to terminate employees, even if they worked as Servers during other shifts — like Mr. Barrera.[75]  Mr. Megason and Ms. Zadoff also testified that they objected to all Captains participating in the tip pool, regardless of whether they provided service to customers.[76]  Given that Plaintiffs' proposed class definition includes "individuals who they allege were not properly participating in the tip pool," they have failed to satisfy the adequacy of representation requirement of Rule 23(a)(4).  *See Gillian*, 2011 U.S. Dist. LEXIS 115833, at *20-21 (explaining that former servers were not qualified to represent a class of individuals who they allege were not properly participating in the tip pool).

### C.    Plaintiffs Cannot Satisfy the Requirements of Rule 23(b)(3)

Even if Plaintiffs could satisfy Rule 23(a) (which they cannot), their § 196-d claim should not be certified because they cannot satisfy Rule 23(b)(3), their stated basis for class treatment.  (Pl. Br. at 18.)  Because Rule 23(b)(3) is "even more demanding than Rule 23(a)" the Court must "take a close look at whether common questions predominate over individual ones."  *Comcast*, 133 S. Ct. at 1432 (internal citations omitted).   Rule 23(b)(3) is satisfied only if *each* class member's claim can be resolved "through generalized proof, and if [class-wide] issues are more substantial than the issues subject only to individualized proof."   *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  The purpose is to "ensure[] that the class will be certified

---

[74] For example, Mr. Barrera testified that both he and Mr. Drill would "discipline" wait staff by telling them how to do their job correctly when they worked as Floor Captains.  **Ex. E**, Barrera Dep. at 21:7–23:15.

[75] **Ex. F**, Megason Dep. at 166:22–172:24.

[76] **Ex. F**, Megason Dep. at 166:22–172:24; **Ex. D**, Zadoff Dep. at 92:16–93:3.

only when it would 'achieve economies of time, effort, and expense....'" *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Plaintiffs' Motion fails because they cannot satisfy the predominance or superiority requirements of Rule 23(b)(3).

### 1. Individualized Inquiries Will "Inevitably Overwhelm" Questions Common to the Class

In order to make liability determinations under § 196-d, the Court would have to conduct a shift-by-shift inquiry to determine whether class members are entitled to recover for any of the four tip pool violation theories advanced by Plaintiffs.  Plaintiffs do not, and cannot, contend that the Stocker and Expediter assignments took place on every shift, or that Mr. Vosilla and/or Mr. Drill received tips during every shift they worked.[77]  Plaintiffs' tip pool claim is simply not susceptible to generalized proof.  Because the number of challenged participants in Fresco's tip pool might differ between lunch and dinner on the same *day*, determining the extent of the injury suffered by each class member would require an individualized inquiry into each shift they worked.  This is precisely the type of individualized inquiry that courts have rejected as predominating over class-wide questions of liability under Rule 23(b)(3).  *See Roach v. T.L. Cannon Corp.*, 2013 U.S. Dist. LEXIS 45373, at *14-15 (N.D.N.Y Mar. 29, 2013) (denying certification of meal break claim where individual class members' damages "varied depending on the number of times each was in a situation falling with the scope of the claim").

Plaintiffs claim that they have "establish[ed] that individualized damages will not overwhelm" class claims.  (Pl. Br. at 18.)  Yet, Plaintiffs have not proffered any method for "easily" calculating their tip pool damages beyond "simply reviewing Fresco's payroll records,

---

[77] *See* Dkt. 54, Megason Dec. ¶¶ 4, 15 (alleging certain violations only "[w]hen there was a private party" or "[f]or some shifts" when the tip pool included an alleged "expediter"); *see also* Dkt. 55, Barrera  Dec. ¶¶ 4, 16; Dkt. 56, Broderick Dec. ¶¶ 4, 16; Dkt. 57, Koltonuk Dec. ¶ 4; Dkt. 58, Perry Dec. ¶¶ 4, 16 ; Dkt. 59, Rodriguez Dec. ¶¶ 4, 15; Dkt. 60, Zadoff Dec. ¶¶ 4, 16 (same).

tip sheets and schedules."[78]  (Pl. Br. at 15.)  But this would require a shift-by-shift examination of *each and every tip pool worksheet* to determine who in the class can recover, and how much they can recover.  To use one such tip pool sheet as an example (**Ex. A**, at DEF00276): assuming *arguendo* that all four tip pool violations had occurred on this particular shift, the Court would have to (i) re-calculate all of the adjusted shares in the tip pool,[79] then (ii) calculate the portion of the total misdirected tips[80] that *would* have been owed to the Servers, but for the ineligible participants, then (iii) calculate the amount owed to class members, by subtracting what was originally distributed to the 11 Servers on duty during that shift.  The end result is $229.66, or $20.88 per class member.  Given the total amount in the tip pool, the number of Servers, and the number of other participants in the tip pool (both eligible and ineligible) changes from shift to shift, these are not the sort of "relatively simple, mechanical calculations" applied in claims for unpaid *wages*, as in the cases cited by Plaintiffs.  (*See* Pl. Br. at 19.)  Further, Plaintiffs' proposal "does not even attempt" to measure the damages attributable to *each* of their tip pool violation theories, even though each one impacts the tip pool differently.  *Comcast*, 133 S. Ct. at 1433.

Plaintiffs' failure to submit any tip pool sheets for the Court's consideration is telling.  Given the "nearly endless" permutations of who should and should not have received tips for a shift, it would take "labyrinthine individual calculations" to calculate damages class-wide.  *Id.*,

---

[78] The schedules only reflect whether a Server was prospectively scheduled to work during a particular shift, not that they worked or received tips.  The best evidence to confirm whether they have any tip pool claim(s) for a particular shift would be their time records coupled with the corresponding tip pool sheets.

[79] Using the same tip pool sheet, **Ex. A** at DEF00276, the (i) adjusted total amount of the pool, adding the Party Captain tips, is $2,400+$88=$2,488; (ii) the adjusted point values for the purported permissible participants, *i.e.*, 11 Servers (x 1 point = 11 points), **3** Runners (x 0.75 point = 2.25 points), 1 Coffee Man (0.6 point = 5 points) and **10** Busboys (x 0.5 point = 5 points) and **no** Floor Captain, or 18.85 points total; and (iii) the adjusted amount of tips owed to the Servers is $1451.88, or $131.98 each.

[80] For this particular shift, this amount would include: $88 from the Party Captain + $166.67 from the Floor Captain (1.5 points x $111.11) + $83.33 from the Runner/Expediter (0.75 point x $111.11) + $55.56 from the Busser/Stocker (0.5 point x $111.11) = $309.00.  Because Mr. Vosilla would not have been the Party Captain for the lunch shift on September 16, 2013, the inclusion of Party Captain tips is assumed solely for the purpose of illustration.

133 S. Ct. at 1434-35.  Because Plaintiffs' tip pool claim is not susceptible to class-wide proof, Plaintiffs have failed to establish predominance under Rule 23(b)(3).

### 2.    Judicial Economy Would Not Be Served By a Class Action

As explained above, even if the Court were to find common issues as to liability on Plaintiffs' tip pool claims, individualized inquiries will predominate over class-wide ones. Indeed, even if the Court made a determination as to liability on the merits of any one of Plaintiffs' tip pool violation theories, or some combination thereof, the Court would still need to conduct a series of mini-trials into each shift in order to calculate the proper (*i.e.*, proportional) amount of damages to be re-distributed among class members for every shift.  This would be nearly impossible to manage on a class basis, and no notion of judicial economy would be served by litigating the facts of each tip pool for every lunch and dinner shift dating back to February 21, 2006.   Accordingly, Plaintiffs' Motion should also be denied because they have not established that a class action is be a superior method of adjudication under Rule 23(b)(3).  *See Wang v. Hearst Corp.*, 2013 U.S. Dist. LEXIS 65869, at *28 (S.D.N.Y. May 8, 2013) ("the individualized nature of proofs in this case signals that case management would be difficult, if not near impossible" and therefore the superiority requirement of Rule 23(b)(3) was not met).

## III.    PLAINTIFFS' SPREAD PAY CLAIM IS ALSO NOT SUITABLE FOR CLASS TREATMENT UNDER RULE 23

### A.    Plaintiffs' Spread Pay Claims Are Neither Common Nor Typical of the Putative Class

Plaintiffs contend that they were "regularly required" to work lunch and dinner shifts on the same day such that "the time elapsed between the start and end of their workday exceeded 10 hours," but were not compensated with an extra hour of minimum wage.[81]  (Pl. Br. at 11.)

---

[81] Dkt. 54, Megason Dec. ¶¶ 41-42,  Dkt. 55, Barrera  Dec. ¶¶ 46-47; Dkt. 56, Broderick Dec. ¶¶ 42-43; Dkt. 57, Koltonuk Dec. ¶ 39; Dkt. 59, Rodriguez Dec. ¶¶ 44-45; Dkt. 60, Zadoff Dec. ¶¶ 38-39.

In addition, several declarants also allege that they somehow know of other tipped employees who were not paid an additional hour of minimum wage when they worked a 10-hour spread.[82]  None of these declarations contain facts, however, regarding how often this practice occurred; other than to vaguely suggest that it happened "regularly."  However, even assuming *arguendo* that double shifts resulted in a 10-hour spread, Plaintiffs provide no basis for comparing how often they themselves, or other class members, were scheduled to work doubles and were not paid spread pay.  A sampling of Megason's schedules show that the number of double shifts he was scheduled to work differed from week to week.[83]  Plaintiffs have not alleged any facts to suggest whether this was typical, how frequently class members also worked a 10-hour spread, or how often they were not paid spread pay after doing so.

Another declarant, Kathryn Perry, suggested that Fresco's "practice" of not compensating Servers for working a 10-hour spread ended in 2013.[84]  However, Ms. Perry produced pay stubs dating back to December 2011 which show that she *was* properly compensated for spread pay that month, and possibly even before then.[85]  The only way to conclude whether or not Fresco actually had a practice of not paying spread pay would be to (a) review each class member's time records to see which weeks they were entitled to spread pay, then (b) examine their weekly pay stubs to confirm whether or not they were compensated.  *See Gillian*, 2011 U.S. Dist. LEXIS 115833, at *19 (explaining that "the issue of whether Fresco's alleged rules [regarding shift pay] violated minimum wage and overtime [laws] depends on the number of hours each individual

---

[82] Dkt. 55, Barrera Dec. ¶ 48, Dkt. 57, Koltonuk Dec. ¶ 40; Dkt. 59, Rodriguez Dec. ¶ 59; Dkt. 60, Zadoff Dec. ¶ 40.

[83] *See* **Ex. H**, Schedules (showing that Megason was scheduled to work three (3) double shifts total during February 2011, and an average of one (1) to two (2) double shifts *per week* in June 2011 and October 2011).  Given that schedules only reflect whether a Server was prospectively scheduled to work, the best evidence to confirm whether they have any spread pay claim(s) would be their time records coupled with their pay stubs to determine whether that employee was adequately compensated.

[84] Dkt. 58, Perry Dec. ¶ 42.

[85] Gelman Dec., Ex. 1.

worked on a particular shift" and denying class certification of plaintiffs' claims). In this regard, Plaintiffs' statements regarding Fresco's spread pay practices are wholly irrelevant. The best evidence of any class-wide practice would be reflected in class members' time and payroll records. *See Roach*, 2013 U.S. Dist. LEXIS 45373 at *11 (explaining that "the law is clear whether a violation of the 10-hour spread requirement occurred. Each individual's claim (or claims) would rise on or fall on the facts of his or her own case [and] [a]n adjudication by one individual would not affect the claims made by others.").

Notably, even though Fresco produced the payroll records for all of the declarants, they failed to submit any of this evidence for the Court's consideration. (*See* Dkts. 54-60.) In addition, Fresco also produced time punch records for these individuals that could also corroborate their assertion that double-shifts *always* resulted in a 10-hour spread. If these records bore out the fact that Plaintiffs were not properly compensated for working a 10-hour spread, it was Plaintiffs burden to submit that evidence to the Court. *See* Fed. R. Civ. P. 23(a); *see also In re IPO*, 471 F.3d at 41. The fact that they did not do so is notable. Accordingly, they have not met their burden to show that their spread-of-hours claims were common and typical of the proposed class, and their motion should be denied pursuant to Rule 23(a)(2) and (a)(3).

**B.   Individualized Inquiries Also Predominate For Plaintiffs' Spread Pay Claim**

The finder of fact would have to perform the same inquiry for determining liability on Plaintiffs' spread pay claim as it would to determine whether Fresco did, in fact, have a policy of not compensating class members for working a 10-hour spread, *i.e.*, an examination of *each* Server's time and pay records. As explained above, these are precisely the type of individualized inquiries that preclude a predominance finding under Rule 23(b)(3). Furthermore, as with their tip pool claim, Plaintiffs have failed to identify any methodology for calculating damages on a

class-wide basis.  *Roach v. T.L. Cannon Corp.* is directly on point.  There — like Plaintiffs have done here — the only proof submitted regarding the employer's allegedly unlawful 10-hour practices consisted of form declarations alleging that "some employees, on various occasions, were denied their 10-hour spread payments."  2013 U.S. Dist. LEXIS 45373 at *10.  In applying *Comcast*, the district judge ruled that such evidence "indicated that damages in this putative class are in fact highly individualized."  *Id.* at *10 (finding that individualized damages inquiries predominated and rejecting class treatment of plaintiffs' 10-hour spread claims under Rule 23(b)(3)).  The Court should reach the same conclusion here, because "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433.  Accordingly, class certification of Plaintiffs' spread pay hours claim should be denied.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully requests that Plaintiffs' Motion for class certification pursuant to Rule 23 be denied.

Date:  July 29, 2013
       New York, New York

Respectfully submitted,

Craig R. Benson
George B. Pauta
Naveen Kabir
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298

25.
